Case number 233713, Total Quality Logistics LLC v. EDA Logistics LLC et al. Argument not to exceed 15 minutes per side. Mr. Jones, you may proceed for the appellant. Good afternoon, Your Honors. May it please the Court. My name is Scott Jones, and I represent the appellant plaintiff in this action, Total Quality Logistics LLC. I'm also here with my colleague and friend, Dan Kinect, from Bricker-Graydon. And then I have Lindsey Sadlowski, who is Corporate Counsel at TQL, and Alicia Gilbert, who is Assistant Corporate Counsel at TQL, behind me. Your Honors, I suspect that we were all mentored as young attorneys that to get to the heart of the matter, you follow the money. And following the money here leads to the inescapable conclusion that the District Court erred in letting Mr. Daniels keep his bag of ill-gotten profits and not awarding TQL any monetary damages. When Mr. Daniels left TQL, he was fully armed to compete with it. He had no prior logistics experience before joining TQL. He was paid to complete TQL's 22-week training program. There were over 100 courses in that program. Mr. Daniels himself acknowledged that he received a good bit of training. He was mentored by successful brokers. He was provided access to TQL's confidential and proprietary business operations. And Mr. Daniels testified that the knowledge that he gained and his experience at TQL gave him a competitive advantage to compete with TQL in the industry. And most important, Mr. Daniels, in his own words, stated that that knowledge and experience allowed him to hit the ground running in competing against TQL. And run Mr. Daniels did. EDA received federal brokerage authority on September 14, 2020. There was an interim time in there where he went to work for someone else, correct? Very briefly, Your Honor. In their own industry, and then that person passed away? That's correct, Your Honor. I believe he was there for about a month to a month and a half. I think he left TQL at the end of June of 2020. And I believe the individual that he went to work for passed away at the end of July, if I'm not mistaken. But he was in the logistics industry. And then in the logistics industry where he began to either meet with or were contacted by the people that he had worked with at TQL, there was a time right after he left that he was not dealing with those people. Isn't that correct? Maybe two months. It's not a long period, I would agree. That's correct, Your Honor. I think that was correct. And this was the time when TQL presumably had assigned somebody else to those individuals? That's correct, Your Honor. But the evidentiary record does not suggest that TQL followed up and continued to work with those people during that time? Judge Schranch, I would disagree with that characterization. Other salespersons were immediately transitioned to those customers. And the record reflects that through those efforts, TQL was able to restart work with a good number of those entities. And that requires communications with the customers. And so through the communications with the customer, they were doing those things to try to retain those guys. So this was a subset? The eight or nine claimed people were a subset of the work that he had done? That's correct. There were nine customers, Your Honor, that Mr. Daniels had called on while he was at TQL. And then subsequently called on when he went to work at TQL. Wasn't some of the testimony that people called him? There is some testimony to that effect, Your Honor. There's also testimony that Mr. Daniels used the contacts information that he took with him from TQL on his phone and made contacts to attempt to do business with those entities. And if those entities called him and chose him for representation, would that be in violation of your understanding of the agreement that he had signed? It would, Your Honor. It would be a violation of his non-compete. It would also be a violation of his non-solicitation. Well, if he didn't solicit them, if they contacted him, it would not be a violation of the anti-solicitation, right? I disagree, Your Honor, because I think with respect to the non-solicitation, it would prevent him from diverting business in any way from TQL. I think the point is that the whole point of the non-compete and the non-solicitation is that TQL was supposed to be provided a year in which they could attempt to triage these customers, attempt to continue their efforts to do work with them. And in this context, they weren't provided that. They immediately had to compete against Mr. Daniels, who was very successful in his efforts to get those clients. Let me ask you this. Doesn't the record reflect that Mr. Daniels requested during discovery that TQL produce documents showing what efforts they made to retain these customers, and TQL refused to do so? That was the basis for the district court not allowing there to be testimony about what efforts were made to retain these customers. Your Honor, the district court held that there was no direct evidence that TQL made attempts to retain these customers. I would submit, Your Honor, that that's not the proper inquiry with respect to this matter. TQL did put on evidence of the efforts that it went to in terms of trying to retain those customers. I understand that there was a discovery dispute early on in the action, that there were requests for productions that were responded to, but there was never any type of motion to compel that was filed with the court. I think importantly, the court need only look at the fact that TQL actually did do work with many of these customers after Mr. Daniels left. That, to me, is very clear evidence of the efforts that it took with respect to retaining those customers. I'm sorry. I thought you were saying that evidence was not provided. Wasn't that Judge Gilman's question, was that you did not provide or place in the record evidence that TQL had made efforts to maintain those clients during that time? I understood the question to be emails or phone logs with respect to customers of TQL. Those were not in the record in the trial court. But with respect to the transitioning of individuals to take over those accounts and the success that TQL had in doing work to retain those customers and being successful in doing so, those are in the record. And I think that that establishes that. Documents or testimony? There was documents and testimony to that effect, Your Honor. TQL produced a timeline with respect to its customers that showed the transition of those matters to other salespeople. It also produced a timeline that showed TQL's revenues that it received from those customers during the time that Mr. Daniels was unlawfully competing against TQL. It sounds to me like what you're saying is there was evidence that TQL assigned these matters to other employees. But wouldn't you have to show that the employees were doing something with those matters, making phone calls, doing those sorts of things? I mean, the district court held a bench trial here, so we're on clearly erroneous on his factual findings. So why is it clearly erroneous? Your Honor, it's clearly erroneous because there is evidence in the record to show that TQL was doing those things by the success that they had in retaining those customers, that they did additional work with respect to those customers. I would also point... I think we need, we're talking about nine customers, right? So I understand that you have a document that shows that all of his customers would have been reassigned. And then the only other document that I heard you mention was the fact that you could show that you didn't get more revenue from those customers, right? As opposed to that they had been contacted or solicited or that you had made a bid and not won the bid. Your Honor, not that TQL didn't get more work from those customers. It was the opposite. TQL produced its revenues, which showed that TQL was able to reestablish work with respect to some of those customers. What about the nine? Those were included in that nine, Your Honor. Okay, so you were soliciting those nine and earning and making earnings from rendering service to them. There was some with respect to that, Your Honor. Clearly not at the levels that existed with those customers prior to Mr. Daniel's departure. But there was evidence that TQL reestablished relationships and did work with those entities after Mr. Daniel's left. Your Honor, briefly, I'd like to, one last point on that, Your Honor. And again, the district court held that TQL was required to put on direct evidence of that. There's no cases in Ohio that support that contention. Lost profits are almost always proved through circumstantial evidence. And this court has instructed district courts that they should draw reasonable inferences in looking at the evidence to determine lost profits. The challenge is to the inference that the court made. Yes, Your Honor. Do you disagree? I do disagree, Your Honor. And I think the other issue is that from my reading of why this was important for the trial court, it seems to be more of a mitigation of damage defense. But there was no mitigation of damage defense raised in the pleadings. There was no record of that in the trial court. So from my standpoint, I don't know that that inquiry was proper, given that there was no mitigation of damage defense raised. Briefly, Your Honor, with respect to the attorney's fees issue, this court in Allied Scrap made very clear that the Ohio Supreme Court in Wilburn made clear that it would enforce a unilateral fee-shifting contract provision. It further held that such provisions are enforceable absent unequal bargaining power and an indicia of compulsion or duress. May I finish my thought on this, Your Honors? Yes, you may. The district court here completely disregarded the inquiry with respect to duress and improperly concluded that this contract or this provision in the contract was a contract of adhesion. And it relied on the Novak case for that finding. And importantly, the Novak decision, Your Honors, specifically determined that the contract at issue in that case was an insurance contract of adhesion, which are presumptively adhesive contracts under Ohio law. Employment contracts, on the other hand, under Ohio law, are not considered to be contracts of adhesion. It seems that my time is up if there's no more questions. Good afternoon, Your Honors. Brian Butler for Ryan Daniels and EDA Logistics. The court was asking about the evidence that was produced, and counsel suggested it was something of a discovery dispute. It really was much more than that. Causation is always an element. Damages from a breach of contract aren't established merely because a party doesn't get money later. There has to be some relation to the failure to continue to receive money and the breach. And what was trying to be elicited with the evidence was, what exactly did TQL do to maintain its relationships with the clients? Any number of circumstances the court could imagine when a salesperson leaves a company and the company does not replace that salesperson and does not replace its relationship with that customer. The company has not lost anything in that circumstance. If Pepsi decided to stop selling in the state of Florida and one of its salespeople went to work for Coke and was selling products in Florida for Coke, Pepsi hasn't lost anything because Pepsi independently decided, we're no longer going to sell in Florida. And that's what happened here, or at least that's what we were attempting to discover with the evidence. And so what was requested was what efforts were made. TQL maintains a very comprehensive system called Load Manager where all contacts with customers are not only tracked, but they're recorded. Now we weren't asking for all of the audio recordings, but we wanted to see how many times were you calling these customers? Were they calling you and asking for you to bid on particular loads and were you responding or just ignoring them? And it wasn't just the documents, Your Honors. It was a 30B6 deposition that was noticed with many of these topics. And the witness that came to the 30B6 deposition was the same sole witness that TQL presented at trial. He's not a broker. He had no relationship with the clients. He had no relationship with my client. He had no relationship with my client's replacements. He was simply someone who's in the corporate environment who handles non-compete cases. He was unable to testify on the notice topics. He had no excuse for why he was unable to testify. He just simply did not. He was not prepared. He could not answer the questions. So at the beginning of the trial, TQL told Judge Cole, hey, this is a discovery dispute. This should have been handled. And Judge Cole's response was, it absolutely is not a discovery dispute. This is the sort of evidence that, at least at the beginning of the trial, may be necessary for you to prove your case. And you did not produce it. Your witness at the 30B6 deposition did not testify about it. And you are not going to be presenting it at trial here. And that's what happened. There was simply no evidence that TQL did anything to maintain a relationship with these customers. So the way it came out of trial, the process of reassigning customers works, is they can either be affirmatively reassigned to another broker, or they can go into sort of an unassigned status, in which case any broker at TQL can, on whatever interval they do, it's weekly or biweekly, claim unassigned customers. And once those customers are either reassigned or claimed, they have a 60-day period with which to do certain things. And it was establish a relationship, maybe broker a load. If you've established a relationship but had not brokered a load, that period could be extended. But what we saw with respect to eight of the nine clients at issue was that a broker was assigned, and exactly 60 days later, the customers went into unassigned status. Now, based on the evidence, the only reasonable presumption was that no work had been done. And we know no loads were brokered during that period. For the ninth customer, the customer did stay in assigned status, and there were a few loads brokered. But it actually was unclear at trial, and I think TQL even conceded, that those loads may have been the result of work Mr. Daniels had done before he left. Because, of course, everything he's doing is in the future. He might have booked the loads in May, and they continued on through June and July. But even with that customer, the work fell off almost completely. So is the issue whether the loss was because your client left and no longer worked in the facility, or was the loss because he was unfairly competing in his new job? Correct. And I would say, as to the former, it goes beyond that. Not just that he left, but that TQL failed to do anything to keep that business. And I think it's important to note that Total Quality Logistics not only pointed to that it's actually a three-month period between the time Mr. Daniels left TQL and when he brokered his first load. I think there was some discussion about when he received his Federal Motor Carrier Certificate. But the evidence established that his actual first brokered load was a little after that. It was in, I believe, early September. It might have even been later in September. But in any event, there was an approximately three-month gap when Mr. Daniels did absolutely no work for any of these customers. And not only was TQL claiming that was some evidence of malfeasance, but it was claiming that it was entitled to damages during that period. The evidence that put on a trial was that Mr. Daniels should pay TQL for the money it lost during the period that he wasn't working at all, at least with respect to these nine customers. And it was just a fundamental... For the declination in their own income from those customers. Correct. And so what TQL's position was is look at the income we earned last year and award it to us for this year. I mean, that's not evidence. That's not a matter of drawing an inference in TQL's favor. That's just simply a lack of evidence. And then even once Mr. Daniels started brokering loads for these customers, 95% of the loads he brokered were for one particular customer. That is a customer that reached out to Mr. Daniels, explained that it couldn't find anyone to broker its loads, that TQL was not doing it, and asked him to help them. And so he did. And your opposing counsel says that even though that customer came to him, he was barred from doing the work. And what is your response to that? Under the non-compete provision, certainly as written, yes. Yes. There's no argument, Your Honors, that he breached the contract as written. The question is whether there was any harm that resulted from it. And under Ohio law, the damage is an element of the claim. So the fact that one breached a contract, if there is no harm, there is no claim for breach of contract. Damages for breach of contract. Yes. Well, damages are, I mean, I suppose there is potential harm that goes beyond monetary damage, but that is an element of the claim. It's not that you establish a breach of contract and then have to prove damages. There is no breach of contract unless there is damage. So until those damages are established, there is no breach. Now, counsel did suggest that TQL did eventually reestablish that relationship, but the evidence showed that it was actually very long after. It was more than a year when TQL started doing business with this one particular customer, and actually did a lot of business, more than Mr. Daniels had ever done with it at TQL. So it was able to do that all while Mr. Daniels was doing work for that customer, which only goes to show that the total absence of work that TQL did with these customers during that period really didn't have anything to do with Mr. Daniels. It had to do with TQL's own failure to pursue the customers. And again, this is TQL's claim. It had the burden of providing evidence to the court in order to prove its claim, and it just failed to do that for whatever reason. Tell me this. Did your client get the same training as the employee in the TQL v. Leonard case, Scott, that the Ohio Court of Appeals decided last year? Your Honor, I would have no way of knowing, unfortunately, because the evidence simply wasn't presented. The evidence of training that was presented at trial was minimal. It was a list with checkboxes next to it, and there were descriptions of a few words. And Mr. Daniels' testimony, and I don't believe it was really disputed, was that most of these things were YouTube videos that were simply linked to him. So it wasn't training that TQL cultivated or made. It was just simply a series of YouTube videos. As I believe the court said, about as specific as TQL's witness got was they taught him lingo. And I think the judge determined in his role as fact finder that that was not sufficient to establish a reasonable basis to enforce a restrictive covenant, nor was it a trade secret. Was that Mark Bosquick, was that the employee, the risk manager that testified for TQL? Yes. And did he not know specifically what training your client got? He was not familiar with the training, Your Honor. He had undergone training himself years ago. He did not know how the training he received related to the training Mr. Daniels received. And he did not know any of the specifics of any of the training programs that TQL said that Mr. Daniels had undergone. On the list, was there a time assigned? Because there was some discussion in the briefing that this particular module lasted eight minutes, or this particular module lasted five minutes. Yes, and I believe there were some that were even under a minute. I think for some of them it was not a consistent in the list that there was time. For some there were, for others there were not. And do you think that the pricing strategies are presumptively a trade secret? They are not, Your Honor. There was, again, no evidence. Why not? Why would pricing strategies not matter? Because there was no evidence, Your Honor, produced about pricing strategy. The only evidence of... Statement of the importance of our pricing strategies. There was a statement that we have pricing strategies and that they're important, but there was no testimony about what those pricing strategies were. A plaintiff cannot establish a fact by merely stating its existence. We have pricing strategies. Well, to be a trade secret, to be something that is worthy of protection, there has to be something unique about it, something proprietary about it. And there was simply no testimony about what these strategies were and about why they should be protected. The only testimony that was elicited is that the prices vary considerably based on fuel prices and truck availability. To the point that brokers were even offering to do loads at a loss in order to keep customers happy. It changed by the day, if not the hour. Sometimes these brokers even shared their information. Is that right about pricing strategies? Is that... It seemed to be a little bit of a black box issue as to how they all worked in the briefing. Your Honor, I believe the sharing had to do with the customers. So the customers would share, you know, TQL quotes. They'll give me a better deal.   Acme will do it for $80. Can you beat $80 or can you do it for $80? And that way... For the same reason. Yes. And the customer is free to do that. There was no confidentiality agreement that TQL had with its customers. It's not a secret. It's not a secret. It could be shared. You know, the customers could print it on a sheet and drop it from an airplane if they wanted to. It's just simply not a secret. And I would like to address the attorney's fees, if I may. Counsel talked about this court's decision in Allied, and certainly this court looked to the Ohio Supreme Court's Wilbourn decision to reach that conclusion. The Allied decision was pretty short. It was about a page long, and the court addressed the issue in front of it as courts tend to do. There was a sale between two commercial parties for, I believe, $3 million of copper. There was no indicia of unequal bargaining power. There was no indicia of an inability to negotiate the terms of the contract. And the court said, based on Wilbourn, absent duress, that's enforceable. What the court did not address, and for good reason, because the issue was not presented, is the very next paragraph in Wilbourn. And in that, the court said, in these other types of contracts, these agreements are not enforceable. And what the court said, in contracts of adhesion, where the party with little or no bargaining power has no realistic choices to terms, fee-shifting provisions are not enforceable. The court made no mention of duress. The court made no mention of fraud. Why is an employment contract a contract of adhesion? I mean, we normally think of that in sort of consumer contracts. You know, I buy an iPhone. They give me some long thing. I click a button. I can't negotiate with Apple. Because as the district court had made a factual finding in this case, there was no negotiation. TQL, for all of its employees, presents the exact same contract. No negotiation or no ability to negotiate. Those could be different things. No ability to negotiate, I believe, was the district court's finding. The testimony was that Mr. Daniels showed up for his first day. The contract was placed in front of him, and he couldn't sign it or leave. There was no opportunity to contact counsel. There was no opportunity to vary the terms. And, in fact, Judge Cole asked Mr. Bostwick during his testimony, are you aware of TQL ever amending the contract? And he said no. And so a contract of adhesion, regardless of how it's offered, it really just depends on the nature of the contract itself. And the Supreme Court, adopting Black's Law Dictionary, simply said a contract of adhesion is one with unequal bargaining power and no opportunity to negotiate the terms. And so whatever context that contract arises in, employment, consumer, insurance, or otherwise, it makes it a contract of adhesion. Thank you. Your time is up. Thank you. Thank you, Your Honor. I'd like to just pick up briefly on the allied decision in Judge Stranch. I know that you were on the panel of that, so I'm always a little bit nervous of talking about decisions when the judge in front of me was participating in that. The inquiry in allied was much more specific than what Mr. Butler talked about. What allied held was that if the core terms of an agreement are negotiated, and that's what happened in that case, and that the defendant in that case did not object to the fee-shifting provision. Here in this case, Your Honor, Mr. Daniels was at a nice job. He was an insurance broker. He was earning a nice living. He came to TQL by his own choice. He participated in face-to-face interviews. He had an opportunity to ask questions there. He had an opportunity to ask questions of human resources after. But the evidence in the record indicates that TQL has not negotiated non-competes. I would say that that's always the standard. No large entity ever says to the larger group of lower-level functionaries, here is our covenant not to compete. You want to talk about it. Your evidence supports that, that if you want to work for us, you have to sign this. Your Honor, that's not the test. I mean, the test is in employment contracts in Ohio, they are not contracts of adhesion. They are presumed to be on equal footing. I mean, Mr. Daniels could take the job or not take the job. He could remain as an insurance broker. Well, but take it or leave it means that there is no opportunity to negotiate, right? Take it or leave it. Well, Your Honor, the facts in this case, there was no evidence that Mr. Daniels tried to negotiate anything. There was no evidence of that at all. There was no evidence that TQL rebuked any attempts by Mr. Daniels to talk about the fee-shifting provision or the non-compete, none. Now, do you have any case that says, an Ohio case that says that all employment contracts are not contracts of adhesion, can never be contracts of adhesion? Your Honor, I think the holding is that I do have that case. And if you give me one second, Your Honor, I can pull that up for you. Can I come back to that, Your Honor? Sure. Thank you. Going back to the training issue, the evidence was very robust with respect to the training that Mr. Daniels received in this case. He was provided access to TQL's confidential information. The evidence showed that he was mentored by different successful brokers. He was taught how to penetrate logistic customers' accounts. He was taught the intricacies of customer lane information. Mr. Boswick testified extensively about the type of training that Mr. Daniels received. And it was the exact same type of training that the court described in Leonard. And importantly, in the Leonard decision, the Supreme Court, there was an application to appeal that to the Supreme Court. The Supreme Court denied that appeal. So I think that's pretty firm standing as Ohio law and is certainly persuasive with respect to this court. And if you give me one second, I can get that cite to you, Judge. Or if you can't, you can send it to us later. Okay. And I see that I'm out of time. Thank you. Thank you, Your Honor. We thank you both for your good briefing and argument. They're helpful to us. We'll take the case under advisement and render an opinion in due course.